UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONAL ELEVATOR | ) | |
| BARGAINING ASSOCIATION; and | ) | |
| FUJITEC AMERICA, INC.; | ) | |
|     Plaintiffs; | ) | |
| | ) | |
| v. | ) | Docket No. |
| | ) | |
| INTERNATIONAL UNION OF | ) | |
| ELEVATOR CONSTRUCTORS; | ) | |
| STEVEN A. BRUNO, Individually and as | ) | |
| Regional Director; INTERNATIONAL | ) | |
| UNION OF ELEVATOR CONSTRUCTORS; | ) | |
| LOCAL 4; DAVID T. MORGAN, | ) | |
| Individually and as Business Manager; | ) | January 19, 2018 |
| and all others conspiring, acting in | ) | |
| concert or otherwise participating with | ) | |
| them or acting in their aid or behalf; | ) | |
|     Defendants. | ) | |

**VERIFIED COMPLAINT**

**THE PARTIES**

1.      Plaintiff, National Elevator Bargaining Association ("NEBA") is a multi-employer bargaining association incorporated under the laws of the State of Delaware with its principal office at Two Klarides Village Drive, #279, Seymour, Connecticut.  NEBA is the representative for collective-bargaining purposes for employer-members who are engaged in the business of constructing, modernizing, repairing and maintaining elevators, escalators, dumbwaiters, moving walkways and similar devices for third parties such as building owners and general contractors throughout the United States, including the Commonwealth of Massachusetts.

2.      Plaintiff, Fujitec America, Inc. ("Fujitec" or the "Company"), a Delaware corporation with its principal place of business located at 7258 Innovation Way, Mason, Ohio, is

engaged in the business of constructing, modernizing, repairing and servicing of elevators and escalators throughout the United States, including Randolph, Massachusetts.  Fujitec is one of the employer-members of NEBA and is represented by NEBA for purposes of collective bargaining.

3.	Fujitec employs elevator constructor Mechanics, Helpers, Apprentices and Assistant Mechanics represented by the International Union of Elevator Constructors (the "IUEC") for and on behalf of its locals including Defendant IUEC Local No. 4 ("Local 4").

4.	This action, for a temporary restraining order, preliminary and permanent injunctive relief and damages for Defendants' improper and unlawful work stoppage and other interferences with the Plaintiff's operations in violation of a collective-bargaining agreement, is a suit for violation of the contract between an employer and a labor organization representing employees in an industry affecting commerce, as defined in the Labor Management Relations Act, 29 U.S.C. § 141 et seq.

5.	This Court has jurisdiction of this action pursuant to 29 U.S.C. § 185(a).

6.	NEBA and Fujitec are employers within the meaning of Section 2(2) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 152(2).

7.	The IUEC, which has a principal place of business at 7154 Columbia Gateway Drive, Columbia, Maryland, is the exclusive collective-bargaining representative of elevator constructor Mechanics, Helpers, Apprentices and Assistant Mechanic, for and on behalf of its local unions, including Defendant Local 4, which has a principal place of business at 50 Park Street, Dorchester, Massachusetts.  Local 4 represents elevator constructor Mechanics, Helpers, Apprentices and Assistant Mechanics employed by Fujitec in the Boston metropolitan area.

8.      The IUEC and Local 4 (collectively, the "Unions") are labor organizations within the meaning of Section 2(5) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 152(5).

9.      Defendant David T. Morgan is the Business Representative for Local 4.

10.     Defendant Steven A. Bruno is an IUEC Regional Director for a region that includes the Boston metropolitan area.

11.     NEBA, on behalf of its employer-members including Fujitec, and the IUEC, for and on behalf of its locals including Local 4, entered into a collective-bargaining agreement, which became effective July 9, 2017 and remains in full force and effect until July 8, 2022 (the "NEBA Agreement").  (A copy of the NEBA Agreement is attached as Exhibit A.)

12.     For many years prior to 2002, the IUEC entered into a series of five-year collective-bargaining agreements with the National Elevator Industry, Inc. ("NEII") a multi-employer bargaining group of which Fujitec was a member.  The IUEC-NEII contracts were referred to as the Standard Agreements.  The last Standard Agreement was effective from July 9, 1997 to July 8, 2002.

13.     In 2002, Fujitec and other elevator companies withdrew from NEII for purposes of collective bargaining.  In 2002, former NEII members/current NEBA members KONE, Inc., ("KONE"), Otis Elevator Co. ("Otis"), Schindler Elevator Corp. ("Schindler") and ThyssenKrupp Elevator Co. ("ThyssenKrupp") negotiated their own collective-bargaining agreements with the IUEC, which had a term of July 9, 2002 through July 8, 2007.  The IUEC characterized these agreements as identical, and referred to them collectively as the "Master Agreement."  At the same time, Fujitec reached its own agreement with the IUEC, which had a

3

term of July 9, 2002 to July 8, 2007, and was substantially the same as, if not identical to, the

Standard Agreements and the Master Agreement.

14.    Fujitec joined NEBA in 2006, and in 2007 NEBA negotiated its first collective-

bargaining agreement with the IUEC, which had a term of July 9, 2007 through July 8, 2012.

Five years later, NEBA negotiated its second collective-bargaining agreement with the IUEC,

which had a term of July 9, 2012 through July 8, 2017.

15.    The NEBA Agreement has language substantially the same as the predecessor

NEBA-IUEC Agreements, the Master Agreement and the Standard Agreements in many articles.

**THE COLLECTIVE-BARGAINING AGREEMENT**

16.    Article XIV of the NEBA Agreement expressly prohibits strikes during the term

of the Agreement. It provides in pertinent part:

**ARTICLE XIV**
**STRIKES AND LOCKOUTS**

**Par. 1.** It is agreed by both parties to this Agreement that so long as the provisions herein contained are conformed to, no strikes or lockouts shall be ordered against either party. It is understood that this Paragraph shall be applied and construed consistent with the provisions of Article IV, Par. 11 concerning Grievance and Arbitration procedure.

**Par. 2.** No strike will be called against the Company by the Union unless the strike is approved by the International Office of the International Union of Elevator constructors. Sufficient notice shall be given to the Company before a strike shall become effective. Except in the case of Contract Service Work as specified in Article IX of this Agreement, work stoppages brought about by lawful picketing or strikes by building trades local unions affiliated with Building Trades Councils shall not constitute a strike within the meaning of this Article.

**Par. 3.** In the event of a strike, work stoppage or lockout affecting Mechanics, Helpers and Apprentices on New Construction or Repair Work, men working on Contract Service shall not be affected by such strike, work stoppage or lockout, and the Union will supply competent men to the Company to do all work covered under Contract service whether such men are continuously employed in this work or not prior to the strike, work stoppage or lockout.

4

17.     Article XV of the NEBA Agreement requires that "[a]ny difference or dispute regarding the application and construction of this Agreement" shall be resolved under the grievance/arbitration procedure set forth in the Agreement, which provides for final and binding arbitration by an impartial arbitrator.  Article XV applies to any and all disputes arising under the NEBA Agreement, including disputes over Article IX, entitled Contract Service.

18.     Article IX of the NEBA Agreement applies to contract service work.

   a.     Paragraph 1 provides:

   Contract Services is hereby defined as any contract obtained by the Company for regular examination or care of apparatus enumerated in Article IV and Article IV(A) of this Agreement and general repairs as indicated in Article VIII, Par. 2 for a period of not less than one (1) month.  Contract Service Work shall be exclusively performed by Elevator Constructor Mechanics, Elevator Constructor Helpers and Elevator Constructor Apprentices.

   b.     Paragraph 5 provides:

   Call-backs on contract service on overtime, except Sundays and holidays, shall be paid for at the rate of 1.7 times the rate of single time.

   c.     Paragraph 8 explains when the premium rate of 1.7 is to be paid, as

follows:

   (a)  Employees engaged in contract service work agree they will respond to call-backs outside of their regular work hours.  The Company, the local union, and the employees shall meet and cooperate in establishing a call-back system, which will cover such issues as a list of employees available on designated dates to respond to overtime call-backs, the number of employees on call-back at any given time, replacements for vacations and holidays, and trading of on-call duty.  In the event the local union, the employees, and the Company cannot agree on the establishment of the call-back system, the Company and the IUEC will meet to establish the system.

   Travel time from home to job and from job to home on overtime call-backs (starting after regular working hours and

5

terminating before start of regular working hours) shall be paid for at the same overtime rate applying to the work.  Travel expenses on overtime call-backs shall be paid as agreed in the Local Expense Agreements.

When consecutive overtime call-backs occur, the employee shall receive the applicable overtime rate and travel expenses from home to job, from that job to one or more other jobs and then back home.

Men called out before the regular working hours shall receive the applicable travel time and travel expense from home to job.  (Exception:  The Company may call and instruct men to report to any given job at his regular starting time on his route in the primary.)

When call-backs made during regular working hours extend into overtime and the employee is authorized to continue work, he shall receive the applicable travel time and travel expense home.

(b)  Employees who are designated to be available for overtime call-backs pursuant to paragraph (a) above, or who are called out before the regular working hours, or who are on call-backs that extend into overtime, shall be entitled to and receive such compensation as described below during the period of time that such employees are responding to call-backs outside of their regular hours of work.

The rate of pay for overtime call-backs shall not be less than 1.7 times the straight time rate of pay.

The premium rate of pay described above is made in lieu of standby pay and in recognition of the fact that contract service employees agree to make themselves available for overtime calls.

(c)  It is understood and agreed that employees who are available to respond to overtime call-backs are waiting to be engaged (as defined by the Fair Labor Standards Act) by the Company.  Employees who are waiting to be engaged are free to participate in personal activities; are not required to remain at home, at the Company's premises or any other specified location during the period that they are on-call.  Employees who are "on-call" may leave the location they have indicated as the place of their primary contact.  However, such employees will be available for callout by either leaving another phone number where they can be contacted or by carrying on their person a communication

6

device such as a pager, cellular telephone, two-way radio, or other such communication device which enables the Company to contact them.

19.     The NEBA Agreement covers the terms and conditions of employment of elevator constructor Mechanics, Helpers, Apprentices and Assistant Mechanics employed by Fujitec in Massachusetts.

<u>**THE UNDERLYING DISPUTE AND THE UNLAWFUL STRIKE**</u>

20.     Fujitec has service and maintenance contracts with more than 100 customers and has approximately 500 units (i.e., one elevator or one escalator) in the Boston metropolitan area. Under those contracts, Fujitec is obligated to maintain, repair and adjust elevators and escalators on an "as-needed basis." Fujitec's service and maintenance contracts in the Boston area require Fujitec to respond to service calls reporting malfunctioning equipment (sometimes referred to as "shutdowns") twenty-four hours per day, seven days per week. Importantly, shutdowns sometimes include "entrapments," where one or more members of the riding public are trapped inside the elevator.

21.     In order to respond to its customers' calls outside of regular working hours and pursuant to Article IX, Paragraph 8, Fujitec, the local union and employees established a call-back procedure approximately 20 years ago. According to that procedure, each Contract Service employee assigned to a Contract Service route ("Route Mechanic") takes a turn as the designated on-call Mechanic. In addition to the Route Mechanics, Repair Mechanic Scott Soullier is on the roster of on-call Mechanics. The weekday on-call shift is from the end of the designated on-call Mechanic's regular working day at 3:30 or 4:00 p.m. until the start of the next regular working day at 7:30 or 8:00 a.m. The weekend on-call shifts are similarly based on the on-call Mechanics' regular working hours (a) from Friday at 3:30 or 4:00 p.m. until Saturday at 7:30 or 8:00 a.m., (b) from Saturday at 7:30 or 8:00 a.m. until Sunday at 7:30 or 8:00 a.m., and (c)

Sunday at 7:30 or 8:00 a.m. until Monday at 7:30 or 8:00 a.m.  Mechanics who are not able to take calls during their scheduled on-call shifts are required to find a substitute.

22.    Fujitec's Contract Service customers are directed to place calls for service outside regular working hours to Fujitec's answering service.  When the answering service receives a call, it sends a text message to the designated on-call Mechanic.  The on-call Mechanic is then expected to contact the answering service to acknowledge and accept the call.  Fujitec provides each service Mechanic a smartphone.

23.    If the on-call Mechanic does not immediately respond, the answering service makes a second attempt, and sometimes more attempts, to reach the on-call Mechanic.  If the on-call Mechanic continues to fail to respond, the answering service contacts the designated back-up Manager or Supervisor, who then calls the on-call Mechanic to dispatch the call.  (Decl. of Fred Miller ¶ 7.)

24.    According to Article IX, Paragraph 8, Mechanics who respond to calls outside their regular working hours are paid 1.7 times the straight time rate for travel to the customer's site, time at the customer's site and travel back home.  Mechanics are not paid for any other time of their on-call rotations.

25.    This was Fujitec's practice for approximately 20 years until on or about December 22, 2017, when, on information and belief, the Unions directed Fujitec's Contract Service employees to refuse to accept calls from the answering service and only respond when contacted directly by the back-up Manager or Supervisor.

26.    The Unions' directive was in response to Fujitec's refusal to pay Contract Service Mechanic Scott Soullier one hour at the Mechanic's rate of pay plus benefits ($126.85) when, after receiving a message from the answering service, he reportedly telephoned and spoke with

the customer on December 20, 2017, during which telephone call Mechanic Soullier and the customer agreed the service call could wait until the next day.  Importantly, Mechanic Soullier did not leave his home; he did not travel to the customer's site; he did not perform any work; he did not travel back to his home.

27.    On December 22, 2017, Defendant-Local 4 Business Manager David T. Morgan called Fujitec Service Supervisor Bart Buonopane to discuss Fujitec's refusal to pay Mechanic Soullier for talking to a customer over the phone on December 20, 2017.  Defendant-Local 4 Business Manager Morgan told Supervisor Buonopane that he was filing a grievance.

28.    Also on December 22, 2017,  Defendant-IUEC Regional Director Steven A. Bruno called Fujitec Vice President East Region Thomas O. Horan regarding the dispute over Mechanic Soullier's claim for one hour's pay.  Vice President Horan told Defendant-IUEC Regional Director Bruno that Fujitec would not pay Mechanic Soullier for talking to a customer on the phone.  Defendant-IUEC Regional Director Bruno said he would file a grievance.  He then told Vice President Horan that the Unions had directed "the men" not to accept calls from the answering service, only from the back-up Supervisor.

29.    While Fujitec's on-call Mechanics have collectively refused to accept calls from the answering service as directed by the Unions, as of January 19, 2018, the Unions have failed to file a grievance regarding Mechanic Soullier's claim for this pay.

30.    Instead of filing a grievance, on December 22, 2017, on information and belief, Regional Director Bruno directed all Fujitec Contract Service employees to stop complying with Fujitec's 20-year practice of accepting overtime service calls from the answering service and directed them to only accept after-hour service calls if contacted by a Manager or Supervisor – as he had earlier told Vice President Horan he would.

9

31.     At or around the same time, Business Manager Morgan told Supervisor Buonopane that Fujitec employees would refuse all calls from the answering service, and that the calls would have to go to Supervisor Buonopane and he would have to dispatch the on-call Mechanics to respond to Fujitec's customers.

32.     Regional Director Bruno's and Business Manager Morgan's directives to Fujitec's Contract Service employees have resulted in delayed responses to Fujitec's customers, which have caused potential danger to the riding public and poor customer service.

33.     On or about January 9, 2018, Fujitec directed its Contract Service employees to accept and respond to calls from the answering service; and Vice President Horan sent an email to Regional Director Bruno and Business Manager Morgan informing them that Fujitec had directed its employees that they were to comply with the Company's 20-year practice of accepting calls from the answering service.  Vice President Horan closed the email by stating that he was available to discuss any of the call-back procedures with them.  A copy of Vice President's Horan's January 9, 2018 email is attached at Exhibit B.

34.     On Wednesday, January 10, 2018, Mechanic Tom Andreasen was the on-call Mechanic.  That evening, Tufts University contacted the answering service to request a response to an elevator that had shut down with one or more passengers trapped inside.  At 7:29 p.m., the answering service sent a text message to Mechanic Andreasen stating:

> ID=39 CRAIG FROM TUFTS UNIVERSITTY [sic] 617-438-
> 3949 /  / 145 Harrison Avenue SACKLER LIBRARY BOSTON
> ELEV #: freight Alt Phone:  ENTRAPMENT REPORTED
> ELEVATOR ENTRAPMENT, PLEASE CALL ASAP

A copy of the Message Detail Report for the Tufts University call is attached at Exhibit C.

35.     Mechanic Andreasen did not acknowledge or accept the call at 7:29.  The answering service attempted to reach Mechanic Andreasen again at 7:31 pm. and 7:36 p.m.

10

Mechanic Andreasen did not respond to the answering service's second or third attempts, so at 7:46 p.m., the answering service called Supervisor Buonopane. Supervisor Buonopane then called Mechanic Andreasen to direct him to respond to the Tufts University call. Mechanic Andreasen admitted he saw but did not respond to the answering service's multiple attempts to dispatch him. Finally, at 7:55 p.m., Mechanic Andreasen sent a text message to Supervisor Buonopane stating "They cancelled BPD got them out," and Supervisor Buonopane responded with "Ok." A copy of the text message exchange is attached at Exhibit D. Although the text message states "BPD," Fujitec understands the Boston Fire Department responded to the service call and forced the elevator doors open to release the trapped passengers.

36.    Although property owners sometimes call their local Fire Departments in emergencies to extricate passengers trapped in elevators, this step is widely considered a last-resort. The majority of Fujitec's customers try to avoid calling the Fire Department because the Fire Department uses the "jaws of life" to pry open the elevator doors to release trapped passengers, which can cause a lot of damage to the elevator and necessitate expensive repairs.

37.    Because Mechanic Andreasen did not respond to the Tufts University call that evening, the university called the answering service the next morning and requested service. A copy of the text message from the morning of January 11, 2018 is attached at Exhibit E.

38.    On Thursday, January 11, 2018, Vice President Horan asked Fujitec Construction and Modernization Superintendent Fred Miller to serve as the first-level back-up for call-backs over the weekend beginning Friday, January 12, 2018. (Decl. of Fred Miller ¶ 9.)

39.    On Friday, January 12, 2018, Vice President Horan sent a memorandum to all Contract Service employees again directing them to comply with Fujitec's longstanding practice of acknowledging and accepting calls from the answering service and advising them that they

will be subject to discipline up to and including termination of employment should they comply with the Unions' directive and refuse to comply with the Company's.  A copy of Vice President Horan's January 12, 2018 memorandum to employees is attached at Exhibit F.

40.    On Friday, January 12, 2018, Vice President Horan called each of three Mechanics assigned to be on-call over the weekend.  Mechanic Soullier was scheduled to be on call Saturday morning until Sunday morning, and Mechanic Bill Curr was scheduled for Sunday morning until Monday morning.  Vice President Horan left voicemail messages for Mechanics Soullier and Curr.  Mechanic Soullier returned Vice President Horan's call on Saturday, and Vice President Horan told him that he is required to accept calls from the answering service and advised him that if he refused, he would be disciplined.  Mechanic Soullier said he "cannot go against the union" and will follow the Unions' directive.  Mechanic Curr never returned Vice President Horan's call.

41.    Despite the memorandum to employees  and Vice President Horan's telephone calls to the Mechanics assigned to the weekend on-call shifts, Mechanic Soullier and Mechanic Curr refused to accept or acknowledge calls from the answering service and delayed their responses to Fujitec's customers until Superintendent Miller called them.

42.    As a result of the improper directives from the IUEC and Local 4, Service Mechanics failed to immediately respond to one service call on the evening of Saturday, January 13 and to three calls on the evening of Sunday, January 14.

43.    The answering service received one call during Mechanic Soullier's shift.  The answering service called Mechanic Soullier at 10:37 a.m.  The answering service called Superintendent Miller one minute later and told him that they had just spoken to Mechanic Soullier and Mechanic Soullier told them that they are not supposed to call the on-call Mechanic

and should be calling the designated Manager or Supervisor in the first instance.  Superintendent Miller told the answering service that was wrong and they were supposed to be contacting the designated on-call Mechanic as they had always done.  Superintendent Miller then called Mechanic Soullier.  Mechanic Soullier acknowledged having received the call but said he did not receive a text message and wanted the answering service to send him a text message also.  Mechanic Soullier also told Superintendent Miller that he knew the customer needed service, but he was waiting for Superintendent Miller to call and dispatch him before he would accept, or respond to, the call.  Superintendent Miller asked the answering service to send Mechanic Soullier a text message, which they did.  Mechanic Soullier then accepted, and responded to, the call.  (Decl. of Fred Miller ¶ 11.)

44.     The answering service received three calls during Mechanic Curr's shift.  In each instance, the answering service sent Mechanic Curr at least one text message and followed up with at least two calls.  Mechanic Curr refused to accept or acknowledge any of the calls from the answering service and instead waited until the answering service contacted Superintendent Miller and Superintendent Miller called him and directed him to respond to the call.  Mechanic Curr's failure and refusal to accept the calls from the answering service resulted in substantially delayed responses ranging from 56 minutes to one hour and 20 minutes.  (Decl. of Fred Miller ¶ 12.)

45.     On Monday, January 15, 2018, Vice President Horan sent a letter to Regional Director Bruno and Business Manager Morgan, with a copy to IUEC General President Frank J. Christensen, demanding that the Unions cease and desist their illegal work stoppage and file a grievance about any dispute over on-call pay or practices.  A copy of Vice President Horan's January 15, 2018 letter to the Unions is attached at Exhibit G.

46.     On Thursday, January 18, 2018, pursuant to Article XXII, Par. 5(e) of the NEBA Agreement, Vice President Horan issued letters to Mechanics Soullier and Curr noting their refusal to comply with his directive and Fujitec's procedures and warning them that a failure to immediately correct their performance will result in additional discipline up to and including discharge.  Copies of Vice President Horan's letters to Mechanics Soullier and Curr are attached as Exhibits H and I , respectively.

47.     On Thursday, January 18, 2018, Mechanic Brendan Conley was the designated overnight on-call Mechanic.  At 3:26 a.m. on Friday, January 19, 2018, the answering service received a call from FT Plus Government Centre requesting immediate service and indicating all elevators were down.  At 3:27 a.m., the answering service sent a text message to Mechanic Conley.  Mechanic Conley did not acknowledge or accept the call at 3:27 a.m.  The answering service called Mechanic Conley at 3:38 a.m., but Mechanic Conley did not accept the call.  The answering service then called Mechanic Conley's alternate phone at 3:50 a.m., but again Mechanic Conley did not accept the call.  At 4:01 a.m. the answering service sent a text message to Supervisor Buonopane, and at 4:04 a.m., Supervisor Buonopane acknowledged receipt of the message.  Supervisor Buonopane then called Mechanic Conley to direct him to respond to the call.  During that call, Supervisor Buonopane asked Mechanic Conley why he had not accepted the call from the answer service, and Mechanic Conley said that he would take calls only from the Supervisor.  Mechanic Conley's refusal to comply with Fujitec's longstanding practice resulted in a delay of more than 30 minutes in responding to the Government Centre.

48.     On Friday, January 19, 2018, Vice President Horan issued an Article XXII, Paragraph 5(e) letter to Mechanic Conley noting his refusal to comply with Fujitec's procedures and warning him that a failure to immediately correct his performance will result in additional

14

discipline up to and including discharge.  A copy of Vice President Horan's letter to Mechanic Conley is attached as Exhibit J.

49.    The work stoppage described in the previous paragraphs is an illegal work stoppage over a dispute that is subject to the NEBA Agreement's grievance and arbitration provisions in violation of Articles XIV and XV of the Agreement.

50.    The unlawful acts specified herein were committed by Local 4 and the IUEC acting through their agents and members in concert.

51.    Fujitec has demanded that the IUEC and Local 4 cease their illegal work stoppage and comply with the NEBA Agreement, but the Unions have refused.

52.    The Defendants' course of actions are in deliberate, willful and calculated violation of the NEBA Agreement in disregard of the arbitration process.

53.    Upon information and belief, unless restrained by order of this Court, the concerted refusal to work by the employees represented by Defendants in violation of the NEBA Agreement will continue.

## THE IRREPARABLE HARM RESULTING FROM THE UNLAWFUL WORK STOPPAGE

54.    Fujitec has contractual obligations to customers to service the elevators including responding promptly to emergency situations where public safety, health and welfare are at risk. The need for an immediate response to elevator problems is especially important at nursing homes, office buildings, apartment buildings, condominium complexes and hotels where individuals, including potentially disabled individuals, need working elevators are necessary for ingress and egress.

55.    The prompt servicing of elevators and escalators in emergency situations, particularly after normal working hours, is important to public safety, health and welfare.  Such

situations have occurred, for example, when smoke or fire threatens buildings, when people become trapped in elevators, and when patient care is interrupted by an elevator failure.  Even at non-hospital locations, emergency calls such as calls involving trapped passengers involve potentially life-threatening situations.  Response time is a key factor in avoiding injury in these situations.  Experience has established that delayed response time will increase the likelihood of injury to persons involved.  Any delay in providing service for trapped passengers increases the risk that the passengers will panic and/or injure themselves by trying to extricate themselves.  Should the trapped passengers get the doors open when the elevator is in between floors and try to climb out, catastrophic results may occur.  Moreover, the longer delay, the more likely it is the customer will call the Fire Department.  Release of trapped passengers by the Fire Department is far from ideal, as it is less safe for the passengers when the responder is not a licensed Elevator Mechanic and often results in damage to the elevator.  Injured passengers have made claims against building owners and Fujitec for personal injuries; and building owners have made claims against Fujitec for property damage.  Because of the work stoppage, Fujitec's ability to respond to emergency calls has been impaired, resulting in potential harm to the public, Fujitec's customers' property and unnecessary expense for Fujitec.  There is no method for calculating the damage being caused by the Unions' illegal work stoppage.  The presence of non-operational elevators and escalators at nursing homes or other locations where the elderly or disabled live or work can exacerbate the conditions created by emergencies.  It is for this reason that Fujitec provides its customers with 24-hour service, every day of the year. Fujitec's customers expect that service and depend on the Company's reliability at all times.  A collective work stoppage or strike by employees refusing to handle service calls seriously disrupts and interferes with Fujitec's service operations in the Boston metropolitan area.  In addition, it poses a serious threat

16

to customer relations and puts the Company at risk of potential liability for its inability to promptly respond to callbacks.

56.     On January 14, 2018 alone, Fujitec received three calls requiring immediate attention but, in each instance, the Local 4 member responsible for responding to the call refused to accept the calls from the answering service. (Decl. of Fred Miller ¶ 12.)  Under normal circumstances, the on-call Mechanic should be able to respond to an emergency service call such as an entrapment within one hour.  In fact, several of Fujitec's contracts specifically require a response within one hour. (Id. ¶ 13.)  Many have penalty clauses should Fujitec fail to meet this requirement.  The on-call Mechanic on January 14, 2018, however, intentionally delayed Fujitec's response by at least 30 minutes and in one case by more than one hour. (Id. ¶ 12.)  Fujitec's ability to meets its contractual obligations to customers has been substantially threatened by the Unions' illegal work stoppage.

57.     The market for elevator and escalator service contracts is extremely competitive. The Unions' work stoppage is preventing Fujitec from fulfilling contractual obligations, and has threatened Fujitec's ability to deliver its usual high-quality service.  Fujitec has a reputation with its customers for providing first-rate service.  The work stoppage has jeopardized Fujitec's good-will and reputation with its customers.  Fujitec has contractual obligations to customers to service their elevators including responding promptly to emergency situations where public safety, health and welfare are at risk.

58.     Fujitec has no adequate remedy at law for the injuries caused and threatened by Defendants' illegal conduct.

59.     Unless Defendants are enjoined from their illegal and unlawful acts, strike, work stoppage, refusal to perform work and interference with work assignments, and are ordered to

resume performance of work, such actions will continue to cause immediate, substantial and irreparable harm to Fujitec, the amount of which cannot be definitely ascertained, in that:

a.    Fujitec will be unable to render adequate performance of its contractual obligations to service elevators; and

b.    Fujitec will suffer temporary and permanent loss of business as a result of damage to its good will and reputation in the industry and its commercial relationships as a result of which its ability to bid on future jobs will be impaired; and

c.    Fujitec will be caused to breach its agreements to provide elevator maintenance service to its customers; and

d.    Members of the public will be subject to threat of irreparable harm.

60.    The effect on the Defendants, if injunctive relief is granted, is less onerous than the harm that will be suffered by Fujitec and its customers if the injunction is not granted.

61.    Fujitec has complied with all obligations imposed by law that are involved in this labor dispute.

62.    Fujitec has made every reasonable effort to settle this labor dispute.

63.    No prior application for the relief herein sought by Fujitec or for similar relief has been made to any court or judge of the United State or of any state.

WHEREFORE, Fujitec demands judgment:

(I)    Granting Plaintiffs a temporary restraining order, and a preliminary and permanent injunction, restraining and enjoining Defendants, their officers, agents, representatives, members, employees and attorneys and all persons acting in concert or participation with them, including but not limited to the individuals named as Defendants in this Verified Complaint, from in any manner or by any means:

18

(A)    Calling, causing, inducing, encouraging, authorizing, conducting, continuing in or engaging in any strike, concerted work stoppage, concerted work slowdown, refusal to work, sit-down or any other act of coercion or interference with Fujitec's normal operations;

(B)    Delaying or refusing to accept service calls from the answering service consistent with Fujitec's 20-year practice or taking any other action that interferes with Fujitec and/or its employees in responding to service calls;

(C)    By Union discipline, penalty or otherwise, interfering with, or inducing or attempting to induce any person to interfere with any employee or agent of Fujitec in the course of any such employee's or agent's work for Fujitec;

(D)    By threats or otherwise, interfering with or attempting to induce any person to interfere with or otherwise affect the ordinary continuation of Fujitec s operation, and from taking any action which would interfere with this Court's jurisdiction in the premises;

(E)    Causing, inducing, conducting or carrying out any concerted activity of any kind having the effect of interfering with Fujitec's normal operations prior to the hearing on Plaintiff's application for a preliminary injunction.

(II)    Directing Defendants to take all reasonable means to communicate and effectuate the provisions of the orders issued by the Court, including but not limited to the holding of meetings with employees represented by Defendant Local 4, and the issuance forthwith of appropriate notices or other communications to the members, officers, and agents of Defendants, and all those in active concert with them; requiring the immediate return to work of all employees of Fujitec represented for collective-bargaining purposes by Defendants; and

rescinding orally and in writing any oral or written notices, orders, directions, or requests to employees of Fujitec authorizing, directing, inducing or encouraging any strike, slow-down, refusal to work, work stoppage or other limitation upon production;

(III)    Directing Defendants together with Plaintiffs forthwith to arbitrate, pursuant to the collective-bargaining agreement between NEBA and the IUEC, the present dispute; and

(IV)    Granting such other and further relief to which Plaintiffs may be entitled, including damages, costs and disbursements of the action.

Respectfully submitted,

NATIONAL ELEVATOR BARGAINING
ASSOCIATION and
FUJITEC AMERICAS, INC.


By their attorneys,

*/s/ Timothy E. Copeland, Jr.*
Timothy E. Copeland, Jr. (BBO #625034)
DOWNS RACHLIN MARTIN PLLC
28 Vernon Street, Suite 501
Brattleboro, VT  05301
tcopeland@drm.com
802-258-3070


Andrea Evans Zoia (BBO# 685658)
*Local Counsel*
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109
azoia@morganbrown.com
617 523-6666


January 19, 2018


20

## VERIFICATION

STATE OF MASSACHUSETTS
SUFFOLK COUNTY, SS.

Thomas O. Horan hereby certifies as follows:

I am the Vice President East Region of Fujitec America, Inc. I have read the foregoing Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief, except as to matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

_____1/19/18_____
Date

_____
Thomas O. Horan

STATE OF MASSACHUSETTS
SUFFOLK COUNTY, SS.

At Randolph, ma, Massachusetts, this __19__ day of ___January___ 2018, Thomas O. Horan personally appeared, gave oath to the truth of the foregoing, and he acknowledged this instrument, by him sealed and subscribed, to be his free act and deed.

Before me _Deborah J. Fiorelli_
Notary Public
Commission Expires: 8-16-24

DEBORAH J. FIORELLI
Notary Public
Massachusetts
My Commission Expires
Aug 16, 2024

18038133.3

21